UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ROSIA SMITH STUCKEY NEALY (a/k/a ROSIA SMITH
NEALY), as the administrator of
the estate of WILLIE STUCKEY  (a/k/a WILLIE T.
STUCKEY JR.), and on her own behalf,

                    Plaintiff,                      **AMENDED
COMPLAINT**

                -against-                  **JURY TRIAL
DEMANDED**

THE CITY OF NEW YORK, LORRAINE BUTTA,      15 CV 5891 (RJD) (VMS)
as the administrator of the estate of JOSEPH BUTTA
(Tax ID # 860275), former New York City Police
Detective FRANK O'KEEFFE (Tax ID # 863961), and
JOHN DOE and JANE ROE (names and numbers
of whom are presently unknown),

                 Defendants.
------------------------------------------------------------------------X

      Rosia Smith Stuckey Nealy (a/k/a Rosia Smith Nealy), as the administrator of the estate

of Willie Stuckey (a/k/a Willie T. Stuckey Jr.) and his mother, by her attorneys, Siegel

Teitelbaum & Evans, LLP, FisherBroyles LLP, and James Lamb, as and for her Complaint,

alleges the following:

<u>**PRELIMINARY STATEMENT**</u>

      1.     Willie Stuckey spent approximately 16 years in prison for a murder and

kidnapping that he did not commit.  He was arrested in 1985 at the age of 16, and spent the

remainder of his life in prison, where he died in 2001 at the age of 32.

      2.     Neither Mr. Stuckey nor his co-defendant, David McCallum, also age 16 at the

time of arrest, were involved in the commission of the murder or any of the charged crimes. On

October 15, 2014, and June 9, 2015, Mr. Stuckey and Mr. McCallum's convictions on all

charges were reversed and vacated, and the indictment was dismissed.

3.      The District Attorney of Kings County ("KCDA"), under the newly elected Kenneth P. Thompson, joined in the motion to vacate the convictions and dismiss the indictment, and acknowledged that the case against Mr. Stuckey should not have been brought in the first place.

4.      Detective Joseph Butta was the New York City Police Department ("NYPD") detective who led the murder and kidnapping investigation that wrongfully implicated Mr. Stuckey and Mr. McCallum. Detective Budda is now deceased, and, accordingly, his estate is named herein through Lorraine Butta as his estate's administrator (hereafter "Detective Butta"). Defendant Detective Frank O'Keeffe was Detective Butta's partner in the investigation of the murder and kidnapping.  The intentional misconduct of Detective Butta and Detective O'Keeffe (the "Named Defendants") led directly to Mr. Stuckey and Mr. McCallum's wrongful arrest, conviction, and imprisonment.

5.      Detective Butta manufactured the prosecution by coercing Mr. Stuckey and Mr. McCallum into falsely confessing to crimes they did not commit. Detective Butta physically abused both boys, and told them that if they repeated on videotape what he had told them to say then they could go home.  As a result of Detective Butta's physical abuse, coercion, fraud and duress, both boys indeed made the videotaped confessions stating what Detective Butta had told them to say.

6.      In addition, the Named Defendants engaged in numerous other acts of misconduct that they could reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty. The Named Defendants did not pursue two alternative suspects, even though (i) these suspects met the description of a witness and the perpetrators of eight similar crimes that had occurred in

the area in the days prior to and including the kidnapping, (ii) Mr. Stuckey and Mr. McCallum did not meet this physical description, and (iii) other evidence tied the two alternative suspects to the crime.  Detective Butta or Detective O'Keeffe did not create a DD-5 of an interview of a witness who provided highly exculpatory evidence.  The Named Defendants also did not create DD-5s of four interviews with one of the alternative suspects, which also provided highly exculpatory evidence.  The Named Defendants focused on Mr. Stuckey and Mr. McCallum as suspects only because two self-interested individuals gave obviously false and misleading statements to the Named Defendants tying Mr. Stuckey to a gun, which was never found. The Named Defendants did not attempt to speak with those individuals mentioned by one of these self-interested witnesses who had falsely tied Mr. Stuckey to the gun, and, thus, did not even attempt to verify his story.  The Defendants knew or should have known that the information these witnesses provided was false and misleading.  In addition, prosecutors in the KCDA's office committed a *Brady* violation by not informing Mr. Stuckey and McCallum's defense attorneys that, after the boys' arrest but before the trial, an alternative suspect was interviewed by a Kings County Assistant District Attorney ("ADA").  KCDA's office prosecutors also committed a *Rosario* violation by failing to turn over to Mr. Stuckey and McCallum's defense attorneys recorded statements by a prosecution witness that related to his testimony.

7.      There was no physical evidence of any kind connecting Mr. Stuckey or Mr. McCallum to the crime. No weapon was recovered, and no DNA, fingerprints, ballistics or other forensic evidence linked either Mr. Stuckey or Mr. McCallum to the crime. Indeed, none of the fingerprints recovered in the carjacked vehicle in which the victim was abducted, or the kerosene can used to torch that vehicle matched Mr. Stuckey or Mr. McCallum's fingerprints.

8.     The two eyewitnesses to the crime did not identify Mr. Stuckey or Mr. McCallum, nor did Mr. Stuckey or Mr. McCallum even match the physical description given by these eye witnesses.

9.     The only evidence tying Mr. Stuckey and Mr. McCallum to the crime were their brief videotaped confessions, which were false and coerced by Detective Butta. For several reasons, Mr. Stuckey's "confession" was demonstrably false at the time  it was given, including that it  (i) was factually inconsistent with the "confession" given by his co-defendant David McCallum; (ii) was inconsistent with the physical evidence; and (iii) contained only facts already known to the NYPD or the KCDA's Office. Indeed, at the hearing vacating Mr. Stuckey and Mr. McCallum's convictions and dismissing the indictment, the ADA representing the KCDA's office's stated that prosecution's case "rested solely" on these statements, and that

> there is evidence that is *unmistakable and unrefutable* that leads one to the conclusion that the statements were not voluntary recollections and admissions of the two defendants, but rather were the product of *improper suggestion, improper inducement and perhaps coercion*. (emphasis added)

10.     This is a civil action pressing claims pursuant to 42 U.S.C. § 1983, the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and New York law. This action seeks monetary damages for Mr. Stuckey's unlawful arrest, malicious criminal prosecution, wrongful conviction, and imprisonment due to violations of his fundamental federal constitutional rights to due process and to be free from unreasonable search and seizure.

11.     The Defendants instigated and continued the prosecution of Mr. Stuckey without probable cause to believe him to be guilty of the crimes charged, manufactured evidence by coercing the confessions of Mr. Stuckey and Mr. McCallum, and failed to turn over exculpatory

evidence to the District Attorney's Office and Mr. Stuckey and Mr. McCallum. Their conduct led to the wrongful and unjust prosecution of Mr. Stuckey.   Further the unconstitutional acts committed by the Named Defendants and prosecutors in the KCDA's office were part of a widespread and persistent pattern and practice at the NYPD and KCDA's office in the years surrounding Mr. Stuckey and Mr. McCallum's arrest and prosecution such that they constituted the custom and *de facto* policies of the two organizations. Policymaking officials at both the NYPD and the KCDA'S office acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of officers and prosecutors not to falsify or manufacture evidence, and to disclose exculpatory evidence/*Brady* material, and turn over *Rosario* material.

## PARTIES AND JURISDICTION

12.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

15.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by serving on the Office of the Comptroller of the City of New York notices of

claim.  On December 30, 2014 she served a notice of claim in her capacity as administrator of

the estate of Willie Stuckey.  On January 12, 2015 she served a notice of claim for her claims

and injuries in her own right, i.e., as the mother or Willie Stuckey.  More than 30 days have

elapsed since Plaintiff served those notices of claim and, within the 30 day time period, no offer

of settlement was made.

16.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law

Section 50-h on January 21, 2015.

17.     Plaintiff is a resident of Jersey City, New Jersey, Hudson County.

18.     Defendant The City of New York ("City") is a municipal entity created and

authorized under the laws of the State of New York.  It is authorized by law to maintain a police

department, which acts as its agent in the area of law enforcement and for which it is ultimately

responsible.  The City assumes the risks incidental to the maintenance of a police force and the

employment of police officers. The Kings County District Attorney is vested with the authority

to make policy for the City concerning prosecutions and actions of assistant district attorneys in

Kings County, New York.  The City is liable where Kings County prosecutors, pursuant to

policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a

conviction.

19.     Detective Joseph Butta, Tax ID # 860275, was at all relevant times a police

officer or detective employed by the NYPD.  Detective Butta died on September 6, 1994.

Lorraine Butta, Detective Butta's widow, was appointed administrator of his estate on January

14, 1998, and is named herein as such. Detective Butta's actions, as described herein, were taken

in his individual capacity.

20.     Defendant Detective Frank O'Keeffe, Tax ID # 863961, was at all relevant times

a detective employed by the NYPD.  He is named here in his individual capacity.

21.     Defendants John Doe and Jane Roe et al., whose identities and number are presently unknown to Plaintiff, are and were at all relevant times officers, employees and/or agents of the NYPD between October 21, 1985 and October 27, 1986 and participated in the investigation of Mr. Blenner's kidnapping and murder.  They are sued in their individual capacities.

22.     At all times relevant to this Complaint, the aforementioned Defendants acted under color state law, including the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

## STATEMENT OF FACTS

The Crime and the Procedural History of the Underlying Criminal Case

23.     On October 20, 1985 between approximately 3:20 p.m. and 3:30 p.m., Nathan Blenner was kidnapped in front of his home at 111th Avenue in the Ozone Park neighborhood in Queens, New York City.  While he was attempting to start his car, two individuals forcibly entered his car and drove off with him in the backseat.

24.     On October 21, 1985, the day after Mr. Blenner was abducted, his body was discovered in Brooklyn in the rear of Aberdeen Park.

25.     On October 22, 1985, one day after Mr. Blenner's body was discovered, his car was identified in Brooklyn.

26.     On or about October 27, 1985 Mr. Stuckey and his co-defendant David McCallum, both age 16 at the time, were arrested and wrongfully accused of the murder and kidnapping of Nathan Blenner, and the related crimes.

27.      Mr. Stuckey and Mr. McCallum were charged with Murder in the Second Degree (two counts), Kidnapping in the First Degree, Robbery in the First Degree, and Criminal Possession of a Weapon in the Second Degree (Indictment No. 6640/85).

28.      On or about October 27, 1986 both Mr. Stuckey and Mr. McCallum were convicted of murder in the second degree, kidnapping in the first degree, robbery in the first degree, and criminal possession of a weapon in the second degree.

29.      On or about November 17, 1986 Mr. Stuckey and Mr. McCallum were sentenced to 25 years to life on the murder charges, with the sentences imposed on the related charges to run concurrently.

30.      Mr. Stuckey was incarcerated from his arrest on October 27, 1985 until his death on December 3, 2001.

31.      After a 10 month investigation by the KCDA's Conviction Review Unit, the KCDA joined in the motion to vacate the convictions and dismiss the indictment, and acknowledged that the case against Mr. Stuckey should not have been brought in the first place.

32.      On October 15, 2014, and June 9, 2015 Mr. Stuckey and Mr. McCallum's convictions on all charges were reversed and vacated, and the indictment was dismissed. Though the motion to vacate was made on behalf of Mr. McCallum and Mr. Stuckey and the Judge's reasoning indicated that the decision to vacate the convictions and dismiss the indictment applied to both Mr. McCallum and Mr. Stuckey, the October 15, 2015 order contained only Mr. McCallum's name in the caption.  Consequently, Ms. Nealy, through counsel, requested an additional order explicitly vacating Mr. Stuckey's conviction and dismissing the indictment against him.  That order was issued on June 9, 2015.

<u>The Two Witnesses of the Kidnapping Did Not Connect Mr. Stuckey or Mr. McCallum to the Kidnapping</u>

33.     Gregory Prasad, age 10, and John Egan, age 11, reported that, on October 20, 1985, at approximately 3:30 p.m., they witnessed Nathan Blenner's kidnapping in front of one of the boy's home. The two boys testified in court that they looked out the window of a porch-like room at the front of Gregory Prasad's home and saw someone inside Nathan Blenner's 1979 black Buick Regal trying to start the car. The boys testified that while the man was trying to start the car, they saw two black men walk a little past the car, stop, look around and then enter the car. The boys also testified that they saw the driver pushed into the back seat, and the two men drive off sitting in the front seats. The boys testified that they were not able to get a good look at the two men. Neither boy was able to identify either Mr. McCallum or Mr. Stuckey as the males who abducted Mr. Blenner.

34.     Both of the boys have stated on the record—both to the ADA, and one in trial testimony—that one of the men was taller than then other. This description does not fit Mr. Stuckey and Mr. McCallum, who, in 1985, were both 5'5" tall.

<u>No Evidence from Mr. Blenner's Car Implicates Mr. Stuckey or Mr. McCallum – but does Implicate Others</u>

35.     When Mr. Blenner's car was discovered it showed signs of being burned by a fire, which had been extinguished. It was discovered because a security guard from a nearby building alerted the police after he saw three black males attempting to gain entry to the car, and one of them lied to him, claiming the car belonged to one of the boys' brother.

36.     Numerous fingerprints were lifted from various surfaces though the front and left side of the car.  In addition, investigators recovered the kerosene can that was used to

start the fire, and prints were found on the can as well.  None of the prints matched either Mr. Stuckey or Mr. McCallum's prints.

37.     The prints taken from the car did match those of two boys who were near the car when it was discovered.

38.     In addition, as part of the KCDA investigation that led to the overturning of Mr. Stuckey and Mr. McCallum's convictions, the KCDA conducted DNA analyses of nine cigarette butts found inside the car.  The DNA analyses showed that two of these butts matched Roland Miley, a person who, on the basis of past criminal conduct, is in the New York DNA registry. Mr. Miley has told the KCDA Conviction Review Unit that he does not know how two cigarettes carrying his DNA ended up in Mr. Blenner's car, and, contradictorily, that he must have flicked the butts into the car as he walked past it on his way to school. He also recently told Mr. McCallum's attorney and investigator that he has no idea how the cigarette butts ended up in the car, and that it must be a mistake.

39.     A credit card receipt found in Mr. Blenner's vehicle establishes that, in the early morning hours of October 21, 1985, the day following Mr. Blenner's abduction, an Amoco credit card belonging to Mr. Blenner's employer was used to buy gas from a gas station on 720 New York Avenue, in the East Flatbush section of Brooklyn.

40.     Neither Mr. Stuckey nor Mr. McCallum knew how to drive.  Neither had a driver's license or access to a car, and neither of them had ever taken a driver's education course.  It is highly unlikely that teenagers in that situation would have been able to drive a car from Mr. Blenner's house in Queens into Brooklyn, drive it around for several hours in unknown parts of the New York City, get gas in East Flatbush with a credit card, requiring them to see the attendant, and then eventually abandon the car some time later. Upon

10

information and belief, neither of the boys had experience using credit cards.  It is also noteworthy that, in their purported confessions, neither Mr. Stuckey nor Mr. McCallum mentioned getting gas while providing the story about driving around in Mr. Blenner's car.

41. Pursuing Mr. Stuckey and Mr. McCallum without investigating the facts raised in paragraphs 35-40, is misconduct that the Named Defendants could reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty.

The Named Defendants' Failure to Pursue Alternative Likely Suspects

42. On October 21, 1985, one day after Mr. Blenner's abduction, when police from the 106th Precinct canvassed the area where the abduction took place, a woman named Kathy Hank told the police that at approximately 2 p.m. on the date of the incident, one to one and a half hours before the abduction, she observed two black males walking past her residence, which is located around the corner from where Mr. Blenner was abducted. She said the males were in their twenties, one was 5'6" and thin, and the other was 5'10", also thin, and had his hair in braids.  Ms. Hank was washing her car, a Buick Regal, the same make as Mr. Blenner's car, but one year newer.   Ms. Hank told the police that one of the males said, "That's a nice looking car." Ms. Hank replied, "If it's not here tomorrow, I'll know where to look." The two men continued walking north toward Mr. Blenner's residence.

43. There were eight other carjackings that occurred in Queens (105th Precinct) on the day of Mr. Blenner's abduction and the two days preceding it, i.e., October 18 -20, 1985. The physical description of the perpetrators in those carjackings matched the description given by Ms. Hank.  Specifically, the perpetrators were two black males ages 18-20, and one man was taller than the other.

44.     Mr. Stuckey and Mr. McCallum did not match the description Ms. Hank gave to the police or the physical description of the perpetrators of the other carjackings.  Neither had braids and both were 5'5" tall -as opposed to 5'6" and 5'10"; also, they were 16 years old, not in their twenties.

45.     On October 25, five days after Mr. Blenner was abducted, Terrence Heyward and Herman Munford were arrested for robbery in the 104th Precinct in Queens.  The 104th Precinct, where Heyward and Munford were arrested, borders the 83rd Precinct, where Mr. Blenner's body and car were found.  Unlike Mr. Stuckey and Mr. McCallum, Heyward and Munford matched the descriptions given by Ms. Hank, and the perpetrators of the eight other carjackings in the 105th Precinct. Heyward and Munford were two black males, one of whom had braided hair (as described by Ms. Hank), and one taller than the other (as described by both Ms. Hank and the DD-5s describing the other carjackings), and were 18 and 19 years old, respectively. In addition, on the day Mr. Blenner was abducted Heyward worked at the store that police had determined sold the kerosene can that had been used to start the fire found inside Nathan Blenner' s car. Heyward also lived close to where Nathan Blenner's body was discovered, at 1148 Halsey St. in Brooklyn.  Further, Munford was near the crime scene when police first found Mr. Blenner's body in Aberdeen Park.

46.     The DD-5s suggest that the police initially suspected that the two men who passed Ms. Hank's residence shortly before the kidnapping were suspects in Mr. Blenner's kidnapping and murder because, when Heyward and Munford, who fit Ms. Hank's description, were arrested in the 104th Precinct, Detective Butta -who is in a different precinct- was called to interview them.

47.     The following facts support pursuing Heyward and Munford further as suspects: (i) an hour to an hour and a half before Mr. Blenner's kidnapping individuals who met their physical description were around the corner from the site of abduction and were interested in a car, which was the same model as the car Mr. Blenner was in when he was abducted; (ii) Heyward and Munford also fit the description of the perpetrators of eight other carjackings that had occurred in Mr. Blenner's area  in the days prior to and including Mr. Blenner's abduction; (iii) Mr. Stuckey and Mr. McCallum did not match a description given by Ms. Hank or of the perpetrators of the eight other carjackings; (iv) Heyward worked at the store that sold the kerosene can that was used to burn Mr. Blenner's car;  (v) Heyward lived near the location where Mr. Blenner's body was discovered, and (vi) Munford was near the crime scene when police first found Mr. Blenner's body.

48.     Despite the facts in paragraphs 42-47 the Named Defendants pursued Mr. Stuckey and Mr. McCallum rather than Heyward and Munford as suspects in the Blenner kidnapping and murder.

49.     There is no explanation in the DD-5s why the Named Defendants did not pursue Heyward and Munford further as suspects. Heyward was interviewed once and there is a DD-5 that documents this interview. Munford was interviewed four times about the Blenner kidnapping and murder, though no DD-5 documents these interviews. (*See*, *infra,* ¶¶ 76-84).

50.     The Named Defendants' failure to pursue Heyward and Munford despite the facts listed in paragraphs 42-47 is misconduct that they could reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty.

<u>A Defendant's Subsequent Interview of Kathy Hank, and Failure to Create a DD-5 of this Exculpatory Evidence</u>

51.     Mr. McCallum's current attorney was able to track down and interview Ms. Hank in 2008.

52.     On October 24, four days after Mr. Blenner's abduction, Ms. Hank called the police to report that her red Buick was stolen.

53.     Ms. Hank informed Mr. McCallum's attorney that, after she called the police to report that her car was stolen, she was visited at her home by a detective who, upon information and belief, was from Brooklyn and brought mug books of robbery arrestees from, upon information and belief, the Brooklyn precinct handling the Blenner murder.

54.     Upon information and belief, the detective that went to Ms. Hank's home was either Detective Butta or Detective O'Keeffe.

55.     Ms. Hank spent time going through all of the mug books but could not identify anyone. Both Mr. Stuckey and Mr. McCallum had been arrested for robbery in the 83rd Precinct prior to their arrest for the Blenner homicide; thus, their mugshots would likely have been in the mug books presented to Ms. Hank.  Also, when Mr. Stuckey was arrested for the Blenner kidnapping and murder he identified McCallum from a book of mugshots in the 83rd Precinct, further increasing the likelihood that Mr. Stuckey and Mr. McCallum's mug shots would have been in the mug books Ms. Hank had looked at. Ms. Hank's mother confirmed this visit of the Brooklyn detective, and viewing of mug books. Her mother and husband (who was then her boyfriend) also confirmed this visit and the viewing of mug books. She provided an affidavit attesting to the above.

56.     This interview in which Ms. Hank looked at mug books and the fact that Ms. Hank could not identify anyone in the mug books was exculpatory evidence that was material to Mr. Stuckey's guilt and punishment.

57.     The Named Defendants neither created a DD-5 of this interview of Ms. Hank in which she looked at mugshots at her home, nor told Mr. Stuckey or Mr. McCallum, or their counsel about it. Thus, Mr. Stuckey and Mr. McCallum's defense counsel had no knowledge of this exculpatory evidence.

58.     Upon information and belief, the Named Defendants did not forward this exculpatory evidence to prosecutors, i.e., upon information and belief, they did not tell prosecutors that one of them had conducted this interview, and did not tell prosecutors that Ms. Hank had looked at mug books that likely contained Mr. Stuckey and Mr. McCallum's mugshots and was unable to identify anyone.

59.     By not creating a DD-5 of this interview with Kathy Hank  and failing to forward this information to prosecutors and Mr. Stuckey and Mr. McCallum's counsel the Named Defendants withheld evidence that was material to Mr. Stuckey's guilt and punishment.

60.     Not creating a DD-5 of this interview with Kathy Hank and failing to forward this information to prosecutors and the defense counsel is misconduct that the Named Defendants could reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty.

Detective Butta's and the Prosecutor's Misconduct Regarding Ms. Hank at Trial

61.     At the trial Detective Butta provided false testimony regarding Ms. Hank.

62.      Though Detective Butta admitted under oath that he and Ms. Hank discussed the men who passed her residence and noted her car, he did not create a DD-5 of this important conversation.

63.     Detective Butta's testimony was internally inconsistent.  First Detective Butta said that Ms. Hank was unable to give him a description of the men who passed her residence and noted her car.  Then, after further cross-examination, he changed his story and claimed that he did not remember what Ms. Hank had told him.

64.     Mr. Stuckey's attorney asked Detective Butta one question that should have elicited from him whether he had showed Ms. Hank photographs in a mug book. However, Detective Butta ignored the question about the photos, and gave a non-responsive answer to this important line of inquiry, which was not pursued further by counsel. Specifically, Mr. Stuckey's counsel asked: "And it's your testimony the next day she [Ms. Hank] couldn't give you a description and wouldn't view photos?"  In response Detective Butta stated:  "She said she was cleaning her car, they passed, she didn't look at them long. She just glanced up when they said something about her car and continued cleaning her car."

65.     The testimony in paragraphs 63 and 64 is false.  Upon information and belief, Detective Butta either interviewed Ms. Hank at her home when she looked at mug books that likely contained Mr. Stuckey and Mr. McCallum's mug shots in order to see if she could identify Mr. Blenner's kidnappers, or knew about that interview. Further, the reason that this interview in which Ms. Hank looked at mug books took place is that she had previously told two NYPD members that she either would or may be able to identify the black males who noticed her car, and gave these NYPD members a description of the men; thus, Detective Butta's testimony that Ms. Hank was unable to give him a description of the men is false.

66.     Detective Butta and the prosecutor misled the jury by suggesting that the two black men noticed Ms. Hank's car at 12 p.m. on October 20 rather than at approximately 2

p.m. – i.e., that the interaction occurred several hours, rather than just one to one and a half hours before Mr. Blenner's kidnapping. Detective Butta testified that he thinks the DD-5 stated Ms. Hank interacted with the two males at 12 p.m. Mr. Stuckey and Mr. McCallum's defense attorneys allowed Detective Butta's misleading testimony to go unchallenged, as they did not call either Ms. Hank or the police officer with whom she spoke in the 106th Precinct to testify to refute Detective Butta's testimony. The prosecutor presumably had the DD-5 that stated the interaction took place at approximately 2 p.m., and, thus, knew or should have known that the interaction took place at approximately 2 p.m. Yet, the prosecutor understood the significant negative effect Detective Butta's misleading testimony had on Mr. Stuckey and Mr. McCallum's case, and compounded the harm by emphasizing the incorrect time in his summation. Specifically, he argued that the information Ms. Hank provided to the police was irrelevant because she had interacted with the men "several hours before" the kidnapping. Thus, the prosecutor and Detective Butta both distorted the facts to hide the obvious conclusion that whoever passed by Ms. Hank's apartment and noticed her car one to one and a half hours before the kidnapping were prime suspects for the kidnapping and murder of Mr. Blenner.

The Named Defendants' Failure to Investigate and Failure to Determine that Self-Interested Individuals Directing them to Mr. Stuckey Gave Patently False Information

67. On October 25, 1985 Mr. Heyward was interviewed by Detective O'Keeffe. He told Detective O'Keeffe that he knew a black male called "Supreme" who was trying to sell a gun he claimed had "a body to it," and that the gun belonged to "James," who resided at 564 Central Ave.

68. Following up on this information, that same day, Detective Butta questioned James Johnson, whose statements pointed him to Mr. Stuckey. During the course of his

conversation with Detective Butta, James Johnson admitted that, during an incident about a week and half earlier, he had fired some shots in Medina Grocery Store on Central and Halsey. He said he fled the grocery store and took the gun to his "Aunt Lottie's" house, and someone in that house, in turn, gave the gun to someone named "Jaime" or "Jamie" (hereinafter "Jaime") who lived a couple doors down the street.  Mr. Johnson claimed that, in a conversation several days after the abduction, Willie Stuckey said he had gotten the gun from "Jaime" and could get it back for Mr. Johnson. Mr. Johnson also claimed he told Mr. Stuckey he did not want the gun.  Thus, according to this self-serving narrative, the gun was passed from Mr. Johnson to "Aunt Lottie" to "Jaime" to Willie Stuckey, who then purportedly said the gun "had a body on it," and attempted to give it back to Mr. Johnson, who declined to take the gun.

69.     According to Mr. Johnson's trial testimony, Detective Butta promised to "forget" about the shooting in the Medina Grocery Store if Mr. Johnson testified to this story.

70.     The Named Defendants never asked Mr. Johnson what type of gun was used.

71.     The Named Defendants never spoke or even attempted to locate and speak with "Aunt Lottie" or "Jaime."  There are no DD-5s in which the Named Defendants attempt to locate or speak with either of these individuals.  Further, according to the current Kings County Conviction Review Unit, "The police never attempted to converse with Aunt Lottie or Jaime (a) to confirm Johnson's story about the chain of custody of the gun, (b) to try to locate the firearm, or (c) determine whether Mr. Johnson was talking about real people or figments of his imagination."

72.     Indeed, when the Conviction Review Unit was re-investigating this case, "Aunt Lottie" was interviewed. She told the unit that (i) no law enforcement person ever talked to her

18

about this subject at any time, (ii) she never kept a weapon for her nephew, and never gave a

weapon to Mr. Stuckey, "Jaime" or anyone else, and (iii) stated "categorically" that Jaime is a

fictitious person.

73.     At the hearing vacating Mr. Stuckey and Mr. McCallum's convictions and

dismissing the indictment, the KCDA's office concluded that Mr. Johnson "gave false and

misleading statements to the police and false and misleading testimony in court at the[]

trial…<u>[which] the police at that time should have been able to determine was, in fact, false and

misleading.</u>" (emphasis added).

74.     Given that (i) both Mr. Heyward and Mr. Johnson had a motivation to lie –

Heyward to point detectives away from himself and towards others as suspects, and Johnson to

secure a deal related to the Medina grocery store shootings – and (ii) the gun – the evidence

Heyward and Johnson claimed linked Stuckey to the crime – was never found, the Named

Defendants' failure to attempted to locate and interview "Aunt Lottie" and "Jaime" is

misconduct that they could reasonably foresee would contribute to the deprivation of Mr.

Stuckey's liberty.

75.     In addition, relying on Mr. Heyward and Mr. Johnson's non-credible statements

linking Mr. Stuckey to the gun, which was never found, is misconduct that the Named

Defendants could reasonably foresee would contribute to the deprivation of Mr. Stuckey's

liberty.

<u>The Named Defendants'  Failure to Write up DD-5s of Four Interviews with Herman Munford
and Failure to Provide this Exculpatory Evidence to Prosecutors and Defense Counsel</u>

76.     Mr. McCallum's investigator and attorney tracked down Mr. Munford at

Riker's Island, where he was detained on a recent re-arrest.  They interviewed Mr. Munford on

January 30, 2014.

19

77.     Mr. Munford confirmed being questioned by the police about the Blenner homicide on four separate occasions. The first was when Munford was riding his bike past the crime scene when police first found the Blenner body in Aberdeen Park—which places Mr. Munford near the crime scene at a crucial moment.  The second was a few days later when he was questioned at his home and then brought down to the 83rd Precinct for questioning. The third was a day or so afterwards, when he was placed in a room with a two-way mirror. Finally, he was brought down one last time and again questioned.  He provided an affidavit to Mr. McCallum's attorney and investigator attesting to all of the above.

78.     No DD-5 reflects any of these four interviews of Mr. Munford.

79.     Upon information and belief Detective Butta and/or Detective O'Keeffe conducted these interviews.

80.     The fact that the Named Defendants interviewed Mr. Munford four times, and that he was at the crime scene when the body was discovered was exculpatory evidence that was material to Mr. Stuckey's guilt and punishment. Knowledge of this information would have provided additional support for putting forward Mr. Munford and Mr. Heyward as potential perpetrators of the Blenner kidnapping and murder.

81.     Upon information and belief, the Named Defendants did not forward this material exculpatory information to prosecutors.

82.     At or before the time of the trial, neither Mr. Stuckey nor Mr. McCallum, nor their defense counsel were ever told about these four interviews of Mr. Munford, or that he was at the crime scene when the body was discovered.

83.     By not creating a DD-5 of these interviews with Munford and the fact that he was at the crime scene at the crucial moment the body was found and failing to forward this

information to prosecutors and Mr. Stuckey and Mr. McCallum's counsel, the Named

Defendants withheld evidence that was material to Mr. Stuckey's guilt and punishment.

84.     Not creating a DD-5 of these interviews with Munford and the fact that he was at

the crime scene at the crucial moment the body was found and failure to forward the information

to prosecutors and the defense counsel is misconduct that the Named Defendants could

reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty.

The KCDA's Failure to Turn Over *Brady* and *Rosario* material to Mr. Stuckey and Mr.
McCallum

85.     In an unusual action, on January 20, 1986, well after Mr. Stuckey's arrest on

October 27, 2015, but before the trial in October of 1986, Herman Munford was interviewed at

the 83rd Precinct by an assistant district attorney in the KCDA's office. This interview was

audiotaped.

86.     In this interview, Munford stated that on October 23, 1985, in "the park," he saw

David McCallum engaged in conversation with Terrence Heyward. Munford stated that he  heard

none of the substance of the conversation, but he saw McCallum with a handgun tucked in his

(McCallum's) pants waistband.

87.     Detective Butta is recorded as being present for Munford's interview, but he did

not write up a DD-5 or make any other report or note of the interview.

88.     Upon information and belief, trial counsel for the Mr. Stuckey and Mr. McCallum

never received the tapes or transcripts of this interview, or were aware that the interview took

place.

89.     The fact that a prosecutor in the KCDA's office interviewed Herman Munford is

itself *Brady* material/exculpatory information. The police initially thought Mr. Munford might

have been a suspect in the Blenner murder and kidnapping. Based on information in the DD-5s

in paragraphs 42-47 of this Complaint he should have been an alternative suspect. The fact KCDA's office took the unusual action of interviewing him well after Mr. Stuckey and Mr. McCallum's arrests is itself exculpatory information that Mr. Stuckey and Mr. McCallum's lawyers could have used to put Mr. Munford forward as an alternative suspect at trial.

90.    The KCDA office's failure to turn over the tapes or transcripts of this interview or let Mr. Stuckey and Mr. McCallum's counsel know that the interview took place is a *Brady* violation.

91.    On April 24, 1986, well after Mr. Stuckey's arrest on October 27, 2015, but before the trial in October of 1986, James Johnson was interviewed at the 83rd Precinct by an ADA in the KCDA's office. This interview was audiotaped.

92.    Detective Butta is recorded as being present for Johnson's interview, but he did not write up a DD-5 or make any other report or note of the interview.

93.    Upon information and belief, trial counsel for Mr. Stuckey and Mr. McCallum never received the tapes or transcripts of this interview, or were aware that the interview took place.

94.    In this interview, Johnson said that Willie Stuckey got Johnson's gun from Jamie, who in turn had received the gun from Johnson's aunt. Johnson claimed to know Stuckey procured the gun from Jamie because Stuckey told him that. Johnson also stated that Stuckey had tried to return the gun to Johnson but Johnson didn't want it because "[Stuckey] was shooting around Hancock, shooting people". Johnson also speculated that Stuckey met up with McCallum and they "did a crime with the gun."

95.    At trial Johnson was called as a witness for the prosecution and testified to these facts.  Specifically, Johnson testified that (i) he gave a gun to his "Aunt Lottie," (ii) his "Aunt

Lottie" and "Jamie" were friendly, and (iii) Mr. Stuckey told him (Johnson) that he got a gun from 'Jamie' and had returned it to "Jamie."

96.     The KCDA's recorded interview of Johnson on April 24, 1986, was *Rosario* material since it is a recorded statement by a prosecution witness which relates to the subject matter of the witness's testimony.  The KCDA's failure to turn over this statement to Mr. Stuckey and Mr. McCallum's attorneys was a *Rosario* violation.

The Physical Abuse, Interrogation, Coercion and Securement of the "Confessions"

97.     On October 27, 1985, Detective Butta picked up Willie Stuckey at around 6:00 p.m. or 7:00 p.m. and brought him to the 83rd Precinct.

98.     Detective Butta gave false testimony at Mr. Stuckey and Mr. McCallum's trial. According to Detective Butta's trial testimony, he asked Mr. Stuckey if he knew anything about the incident in Aberdeen Park and Mr. Stuckey said "yes."  He then showed Mr. Stuckey a photo of Nathan Blenner's car and Mr. Stuckey said he knew about it. Detective Butta advised Mr. Stuckey of his rights and Mr. Stuckey supposedly promptly volunteered his confession to the crime.

99.     In fact, Mr. Stuckey was handcuffed in a room in the precinct while being questioned by Detective Butta and two other officers.  Upon information and belief, one of these two other detectives was Detective O'Keeffe.  When Detective Butta asked Mr. Stuckey if he knew anything about the car he denied knowing anything. Detective Butta then hit him three or four times during the course of the interrogation. Detective Butta told Mr. Stuckey if he made a statement on tape in which he said "everything that he [Detective Butta] told me to say" then he could go home. Detective Butta then went over the statements Mr. Stuckey was to make on videotape, telling Mr. Stuckey the facts he was supposed to say. Mr. Stuckey testified that he

would have parroted anything Detective Butta told him to say when he was told that making such statements would allow him to go home.

100.    Upon information and belief Detective Butta or his agent contacted the Kings County District Attorney's office and requested that an attorney come to the police station to take Mr. Stuckey's confession.

101.    That evening, ADA Rappaport went to the 83rd Precinct to take the videotaped statement from Mr. Stuckey. Prior to taking the videotaped confession ADA Rappaport met with Detective Butta, and Detective Butta informed ADA Rappaport that Mr. Stuckey was willing to speak with him.  ADA Rappaport took Mr. Stuckey's videotaped statement, and Detective Butta was in the room the entire time.  ADA Rappaport finished recording Mr. Stuckey's statement at approximately 9:15 to 9:30 p.m.

102.    By, *inter alia*, physically abusing and coercing Mr. Stuckey, and telling him what false statements to make on his videotaped confession —which Mr. Stuckey subsequently made—Detective Butta initiated the prosecution by creating what he knew was false information and fabricated evidence that is likely to influence the grand and petit juries.  Detective Butta's purpose was to obtain Mr. Stuckey's unlawful arrest, wrongful conviction, and unjust imprisonment.

103.    By, *inter alia*, causing ADA Rapport to come take Mr. Stuckey's false confession, and forwarding DD-5s with this false confession to prosecutors, Detective Butta forwarded false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Mr. Stuckey, even though he could reasonably foresee that his actions would contribute to the prosecutors' subsequent decision to prosecute Mr. Stuckey and obtain his conviction and imprisonment.

104.    While Mr. Stuckey remained in custody, Detective Butta and Detective O'Keeffe went to Mr. Stuckey's home to look for the gun that, according to the "confession," was supposed to be under his mattress.

105.    No gun was ever recovered from under the mattress or anywhere else.

106.    Detective Butta claims to have called back to the precinct and spoken with Mr. Stuckey who informed him that his friends may have taken it the previous day. Detective Butta, Detective O'Keeffe, and James Johnson then went to 1061 Jefferson and spoke to someone who was likely one of the friends that Mr. Stuckey had mentioned. This person claimed to know nothing of the gun, so the officers gave up looking for the gun and began looking for Mr. McCallum.

107.    Detective Butta also gave false testimony related to Mr. McCallum at Mr. Stuckey and Mr. McCallum's trial.  According to Detective Butta, he found Mr. McCallum that evening, and brought him to the precinct at approximately 10:55 p.m.  According to Detective Butta, he advised Mr. McCallum of his rights before Mr. McCallum agreed to speak with him regarding what occurred on October 20, 1985. More specifically, Detective Butta testified that, after he had read Mr. McCallum his rights and had showed Mr. McCallum that Mr. Stuckey had been arrested earlier that evening, Mr. McCallum freely confessed.

108.    In fact, Mr. McCallum was confronted by Detective Butta in front of a store on Wilson Ave at about 10:30 p.m. that night. Detective Butta handcuffed him, and did not tell him why he was being brought to the precinct. On the way to the precinct, one of the detectives threatened to slap Mr. McCallum. Upon information and belief the detective who threatened to slap Mr. McCallum was Detective O'Keeffe. Upon arriving at the precinct, he was read his rights and asked if he knew anything about the incident on October 20, 1985. When Mr.

McCallum said he knew nothing, Detective Butta slapped him in the mouth, drawing blood. Detective Butta showed Mr. McCallum that Mr. Stuckey had been arrested, and told him that Mr. Stuckey had told the police a story about the kidnapping and murder. At some point, Detective Butta picked up a chair and threatened to hit McCallum across the head with it if he did not give him the facts. Continuing to follow the same approach he used on Mr. Stuckey, Detective Butta promised Mr. McCallum that if he blamed Mr. Stuckey as the shooter, Mr. McCallum could go home.  Finally, Detective Butta "lead [sic] [him] to the facts and [he] just answered them."

109.    When ADA Rappaport was still at the police station Detective Butta informed him that Mr. McCallum was willing to speak with him.

110.    Sometime after 12 a.m., ADA Rappaport taped McCallum's confession, and Detective Butta was in the room the entire time.

111.    By, *inter alia*, physically abusing and coercing Mr. McCallum, and telling him what false statements to make on his videotaped confession —which Mr. McCallum subsequently made—detective Butta initiated the prosecution by creating what he knew was false information and fabricated evidence that is likely to influence the grand and petit juries to convict Mr. Stuckey and Mr. McCallum. Detective Butta's purpose was to obtain Mr. Stuckey and Mr. McCallum's unlawful arrest, wrongful conviction, and unjust imprisonment.

112.    By, *inter alia*, causing ADA Rapport to come take Mr. McCallum's confession and forwarding DD-5s with this false confession to prosecutors, Detective Butta forwarded false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Mr. Stuckey and Mr. McCallum, even though he could reasonably foresee that his actions would contribute to the prosecutors' subsequent decision to

prosecute Mr. Stuckey and obtain his conviction and imprisonment.

113.     Mr. Stuckey and Mr. McCallum succumbed to the Named Defendants' pressure to confess. By the time each had agreed to make the videotaped statement for the ADA, each had been subjected to Detective Butta's physical abuse, psychological duress, coercion, and outright fraud and deception.

114.     Both Mr. Stuckey and Mr. McCallum immediately recanted their confessions and pled not guilty, opting for trial and rejecting plea bargains of fifteen years to life.

<u>The Falsity of the Confessions</u>

115.     Professor Steven Drizin is a leading authority on false confessions, and the former Legal Director of the Northwestern University School of Law's Center on Wrongful Convictions. He examined the tapes of Mr. Stuckey and Mr. McCallum's confessions and found they contain many of the key indicators of false confessions. First, as in the Central Park Jogger case, there are numerous inconsistencies between Mr. Stuckey's and Mr. McCallum's confessions - e.g., how the kidnapping occurred, the number of shots fired, the route the boys followed after the shooting, and what happened to the car. Second, the description of the shooting in both confessions is inconsistent with the physical evidence.  For example, the Medical Examiner's report indicated that Mr. Blenner was not shot at close range, but both boys' confessions described a close range shooting.  Third, neither Mr. Stuckey nor Mr. McCallum was able to lead the police to any evidence that corroborated the confessions, including the murder weapon, Mr. Blenner's wallet, and the credit card that was stolen from Mr. Blenner and used by the perpetrators to purchase gas.  Fourth, there is evidence that the police "contaminated" the confessions by feeding facts to the boys that only the police and the true perpetrators should have known. For example, James Johnson had told an investigator that Terrence Heyward "had been

27

arrested for snatching a chain from a woman." Stuckey, in his videotaped confession, stated several times that McCallum had snatched a chain from a man; though, twice Stuckey claimed this occurred on the train, and once claimed it occurred after they had gotten off. Moreover, the second time he mentioned the snatched chain he initially said McCallum snatched from a "lady" and then corrected himself and said it was from a man. The only way Stuckey could have known about the chain was if the detectives had fed him that fact, and the inconsistent repetition of the fact indicates he was trying to remember what he was supposed to say. Fifth, neither Stuckey nor McCallum offered evidence about the crime that was new to the police or the KCDA. Indeed, Mr. Stuckey and Mr. McCallum's confessions were extremely short - Mr. Stuckey's statement was approximately 9 minutes and 16 seconds; Mr. McCallum's statement lasted approximately 3 minutes and 13 seconds- and provided very few details about the crime at all.

116. Mr. Stuckey, in his initial confession to the police, "confessed" to the fact that he and Mr. McCallum were the two individuals who passed Ms. Hank's residence and noted her red Buick, and that Mr. McCallum said "that's a nice car." However, subsequently at the trial, the KCDA argued that the two individuals who noted Ms. Hank's car were *not* the individuals who abducted and murdered Mr. Blenner; i.e., that the individuals who passed Ms. Hank's car were not Mr. Stuckey and Mr. McCallum. The <u>ADA essentially admitted that Mr. Stuckey had falsely "confessed" to passing Ms. Hank's residence</u> before the Blenner kidnapping.

<u>The Named Defendants' Malice and Deliberate Indifference</u>

117. By physically abusing and coercing Mr. Stuckey and Mr. McCallum into falsely confessing Detective Butta demonstrated his indifference to Mr. Stuckey's innocence, reckless disregard of Mr. Stuckey's rights, and malice.

118. The Named Defendants' failed to undertake even basic investigation tasks and

deliberately ignored investigative leads that would have proved Mr. Stuckey's innocence, which further confirms their indifference to Mr. Stuckey's innocence, reckless disregard of Mr. Stuckey's rights, and malice.  For instance they

    a.  did not pursue Heyward and Munford as suspects even though (i) an hour to an hour and a half before Mr. Blenner's kidnapping individuals who met their physical description were around the corner from the site of abduction and were interested in a car, which was the same model as the car Mr. Blenner was in when he was abducted; (ii)  Mr. Stuckey and Mr. McCallum did not match a description of these men; (iii) Heyward and Munford also fit the description of the perpetrators of eight other carjackings that had occurred in Mr. Blenner's area  in the days prior to and including Mr. Blenner's abduction; (iv) Heyward worked at the store that sold the kerosene can that was used to burn Mr. Blenner's car; and (v) Heyward lived near the location where Mr. Blenner's body was discovered;

    b.  did not create a DD-5 of the interview of Kathy Hank that provided the highly exculpatory evidence that Ms. Hank had looked  at mug books that likely contained Mr. Stuckey and McCallum's mugshots, but could not identify anyone as the individuals with whom she had interacted;

    c.  never asked Mr. Johnson, Mr. Stuckey or Mr. McCallum what type of gun was used;

    d.  did not display either Mr. Stuckey or Mr. McCallum or Heyward or Munford in a lineup for Gregory Prasad, John Egan (the boys who witnessed the kidnaping), or Kathy Hank, even though all were available to participate in such an identification;

e.  did not attempt to find and interview Aunt Lottie or Jaime (i) to confirm Johnson's story about the chain of custody of the gun, (ii) to try to locate the firearm, or (iii) determine whether Mr. Johnson was talking about real people or figments of his imagination;

f.  relied on Heyward and Johnson's self-serving statements linking Mr. Stuckey to the gun even though (i) the gun was never found, and (ii) both individuals had a tremendous motivation to lie, and thus, were both obviously unreliable witnesses;

g.  did not create a DD-5 of any of the four interviews with Munford, and never told prosecutors or defense counsel about these interviews, and the fact that Munford was at the crime scene when Mr. Blenner's body was discovered, all of which were exculpatory of Mr. Stuckey;

h.  did not question the fact that ( i) the gun was never found; (ii) Mr. Stuckey and Mr. McCallum's fingerprints were not on Mr. Blenner's car or the kerosene can used to burn the car; and( iii) neither was able to drive a car, and thus, would have been unable to drive Mr. Blenner's car around for several hours in unknown parts of the New York City, get gas in East Flatbush with a credit card (where the credit card showed the perpetrators obtained gas) and then eventually abandon the car some time later in Brooklyn.

119.  The Named Defendants knew or should have known that they did not have probable cause to arrest and prosecute Mr. Stuckey because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false. They procured the indictment by manufacturing evidence (coercing Mr. Stuckey and Mr. McCallum into falsely confessing), suppressing evidence (i.e., failing to create DD-5s of the

30

interview with Ms. Hank in which she looked at mug books, and the four interviews with Munford), and other police misconduct undertaken in bad faith, i.e., the actions or inactions described in, *supra*, ¶ 118 (a), (c), (d), (e), (f ) and (h) above. There was no physical evidence linking Mr. Stuckey to any of the crime scenes (the kidnapping, the cite at which the body was found, or the cite at which the car found). The only evidence tying Mr. Stuckey to the crime came from the two unreliable individuals, and the false confessions, both of which the Named Defendants knew or should have known were false. Nevertheless, the Named Defendants caused Mr. Stuckey to be indicted for the murder and kidnapping of Nathan Blenner, and the related charges.

120.    The Named Defendants procured an indictment against Mr. Stuckey in bad faith and conspired to charge him with falsely committing the murder, kidnapping and related crimes in bad faith.

121.    The Named Defendants' actions constitute outrageous and reckless conduct, and demonstrate a callous indifference to and willful disregard of Mr. Stuckey's federal and state protected rights.

122.    Mr. Stuckey is innocent.

Mr. Stuckey's Injuries

123.    Mr. Stuckey had been falsely branded a murderer and kidnapper harming his reputation and character from the time of his arrest until his death. His reputation in the community and among his close relations was shattered. His relationships with these individuals had been irreparably damaged by his wrongful conviction.

124.    The injuries and damages suffered by Mr. Stuckey include, but are not limited to the following:

a.  Mr. Stuckey was deprived of his civil rights, falsely arrested, falsely imprisoned, beaten by members of the NYPD at the time of his arrest, maliciously prosecuted, and, for approximately 16 years, forced to be incarcerated for a crime he didn't commit.

b.  Mr. Stuckey's injuries attributable to his unjust conviction and imprisonment include, but are not limited to: loss of enjoyment of life; loss of all of life's joys and privileges; inability to lead a normal life, including loss of basic, fundamental human contact; loss of natural contact with significant others; loss of natural contact with his family and friends; loss of the natural role he played within his family; physical injuries; personal injuries; loss of income; loss of employment opportunities and seniority; loss of employment and business experience; loss of benefits; loss of retirement pensions and savings; loss of economic opportunity; pain and suffering; severe mental anguish, emotional distress and injuries, including, but not limited to, anxiety, stress and tension and fear;  lack of privacy; inadequate medical and dental care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions on or total deprivations of  all personal freedoms, liberties and entitlements, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic  opportunity,  hobbies,  religious fulfillment, personal fulfillment, sexual activity, family relations, reading, movies, travel, driving, enjoyment, expression and positive life experience, and premature death.

<u>Ms. Nealy's Appointment as Administrator and Damages</u>

125.    On or about February 13, 2015 the Surrogate's Court of the County of Kings

issued the Letters of Administration of Willie Stuckey appointing Ms. Nealy administrator of the estate of Willie Stuckey.

126.    Ms. Nealy, in her own right, suffered emotional injuries, was deprived of her son's future services in all respects, including but not limited to the loss of love, comfort, society, attention, services such as chores around the house, and support.  As a result of her son's wrongful incarceration and premature death she has also lost income and had a worsened career trajectory, and has incurred expenses, including but not limited to cremation expenses and expenses incurred in traveling to visit him at various facilities throughout the state.  Ms. Nealy missed time at work grieving her son's death. Additionally, Ms. Nealy has endured the emotional distress of watching her son suffer while he was falsely arrested and wrongfully convicted and incarcerated, and of being publicly branded a mother of a murder.

The City's Constitutional Violations

127.    In the years surrounding Stuckey's false arrest, malicious prosecution and wrongful conviction, officers of the NYPD routinely engaged in misconduct, including, but not limited to: (a) falsification or manufacturing of evidence, including but not limited to coercing confessions, coercing witnesses into falsely inculpating defendants, and manufacturing confessions; and (b) failing to turn over exculpatory evidence/*Brady* material to prosecutors and/or defendants.

128.    In the years surrounding Stuckey's false arrest, malicious prosecution and wrongful conviction, members of the KCDA's office routinely engaged in misconduct, including, but not limited to failing to turn over exculpatory evidence/*Brady* material and *Rosario* material.

129.    These are among the types of misconduct that sent Stuckey to prison for approximately16 years for a crime he did not commit.

130.    In the 1980s and early 1990s, falsification or manufacturing of evidence and the failure to turn over exculpatory evidence/*Brady* material were regular practices of the NYPD, and the failure to timely disclose exculpatory evidence/ *Brady* material and *Rosario* material, were regular practices in the KCDA's office. The practices were so widespread and persistent that they constituted the custom and *de facto* policies of the two organizations. At the time of Stuckey's arrest, policymaking officials at both the NYPD and the KCDA'S office acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of police officers and prosecutors not to falsify or manufacture evidence, and to disclose exculpatory evidence/*Brady* material, and turn over *Rosario* material.

131.    Supervisory personnel in both offices were aware of this widespread and persistent misconduct, but took no adequate corrective or preventive measures. NYPD officers, line prosecutors in the KCDA's office, and their respective supervisors were deliberately indifferent to the abuses inflicted on individuals suspected of or charged with criminal activity, whose convictions were regularly secured without regard to their constitutional rights or their guilt. Officers and prosecutors were left to operate with the assumption that they could engage in these abuses without risking appropriate disciplinary consequences.

132.    The consequences for criminal defendants and society were enormous. Throughout this period, one false conviction after another was secured, and dozens of innocent men and women, if not more, were sent to prison from Kings County alone. In 2009 the *Final*

*Report of the New York State Bar Association's Task Force on Wrongful Convictions* concluded that government errors like the ones committed in Stuckey's case caused well over half of the wrongful conviction cases.

133.    Published judicial opinions and other public records alone show that in the 1980s and early 1990s, many of criminal defendants were convicted in Kings County alone by means of similarly unconstitutional tactics by police officers and prosecutors and subsequently had their convictions vacated or were acquitted on retrial. These individuals include, but are by no means limited to, Jeffrey Blake, Lamont Branch, Calvin Boyette, Eric Jackson-Knight, Alvena Jennette, Darryl Austin, Robert Hill, Sami Leka, William Lopez, Todd Lumpkins, John Malfredi, Harry McFarlane, Ronald Pondexter, Antonio Vilardi, Derrick Deacon, Shariff Wilson, Antonio Yarbough, Colin Warne, Cy Greene, Barry Gibbs, Jonathan Fleming, Derrick Hamilton, David Ranta, and Shabaka Shakur.

The NYPD's Policy or Practice of Falsifying/Manufacturing Evidence

134.    Detective Butta's coercion of Stuckey and McCallum into falsely confessing to crimes they did not commit, including,  telling Stuckey and McCallum the statements to make in their videotaped confession, was a form of falsification/manufacturing of evidence.

135.    Similar to Detective Butta's conduct towards Mr. Stuckey and Mr. McCallum, NYPD detectives in the 1980s and early 1990s engaged in a widespread and persistent pattern and practice of coercing others into confessing to crimes they did not commit, and for which they were subsequently exonerated.  These individuals included:

   a.    Shariff Wilson (crime in 1992; convicted in 1994; conviction vacated and indictment dismissed in 2014; District Attorney's office joined in the motion to vacate): Brooklyn detectives engaged in coercive, threatening tactics to obtain 15

year old Sharriff Wilson's false confession to multiple murders.  These unlawful

tactics were similar to those used on Mr. Stuckey and McCallum.  Just as in the

Stuckey and McCallum confessions, the detectives verbally threatened Wilson,

physically assaulted and battered him, and told him that if he told them what they

wanted him to say he could go home.  Also similar to Mr. Stuckey and

McCallum's cases, the detectives provided Wilson with non-public facts about the

murders, and told him to provide these details when he  later made the videotaped

confession.

b.  Antonio Yarbough (crime in 1992; convicted in 1994; conviction vacated and

indictment dismissed in 2014; District Attorney's office joined in the motion to

vacate): In 1992, Brooklyn detectives engaged in coercive, threatening tactics to

obtain 18 year old Antonio Yarbough's (Wilson's co-defendant) false confession

to multiple murders.  The unlawful tactics used in Yarbough's case were similar

to those used on Mr. Stuckey and McCallum. One of the detectives physically

assaulted Yarbough, striking him multiple times on the head and face. Detectives

also threatened him; for example, one of the detectives threatened that he would

"blow your brains out if you don't make a statement." Another detective told him

that if he just signed a confession, the interrogation would end and he could later

tell the judge that the signature on the confession did not match the handwriting,

and that the judge would believe him.  The detectives also provided Yarbough

with non-public facts about the murders. Yarbough succumbed to the detectives'

threats and intimidation and signed the statement confessing to the crimes that the

detectives had written out for him.

     c.   <u>The Central Park Jogger case (Kevin Richardson, Raymond Santana, Jr., Antron McCray, Kharey Wise and Yusef Salaam) (crime in 1989, convictions in 1990, convictions vacated and indictment dismissed in 2002; District Attorney's office joined in the motion to vacate)</u>:  In 1989, these five teenagers, ages 14 to 16 at the time of arrest and interrogation, were wrongly arrested for the brutal attack and rape of a female jogger in Central Park.  All made false, videotaped confessions. As with Mr. Stuckey and Mr. McCallum, the police used physical assaults and intimidation to compel confessions from three of the defendants in the Central Park Jogger case. In the course of the interrogations police assaulted Wise, physically threatened Santana, and enlisted McCray's father to physically intimidate him. Also by way of intimidation, the police yelled or screamed at Salaam, Santana, McCray and Wise. Further, the police falsely promised Richardson, McCray, Wise, and Salaam that they could go home if they confessed and fed them information about the crime, as had been done with Stuckey and McCallum. In addition, Richardson, Santana, and Salaam were kept awake and deprived of sleep and Wise was held overnight at the precinct.

136.   Published court decisions from the late 1970s and early 1980s further demonstrate the NYPD detectives' pattern and practice of coercing individuals into confessing to crimes.  For example:

     a.   *People v. Brown*, 63 A.D.2d 584, 404 N.Y.S.2d 617 (1st Dep't 1978) (reversing 1975 conviction and vacating plea upon finding that, in totality of circumstances, confession was not voluntary, where, *inter alia*, during interrogation detective told defendant that he felt like putting defendant's head through a wall); and

     b. *People v. Johnson*, 112 Misc.2d 590, 447 N.Y.S.2d 341 (Sup. Ct. NY Cty. 1981) (suppressing confession and finding that confession was involuntary where police interrogation conduct included, *inter alia,* threats of prolonged jail time and promises of leniency as well as deprivation of food during lengthy and intensive interrogation).

137.    Detective Butta not only coerced Mr. Stuckey and Mr. McCallum into falsely confessing, but also falsified/manufactured evidence by coercing both of these 16 year old boys into stating that the other had pulled the trigger.  By so doing, Detective Butta coerced Mr. Stuckey and Mr. McCallum into inculpating another innocent person.  In Brooklyn alone, in 1980 through 1992, at least ten individuals who were later exonerated or acquitted on retrial, had been convicted at least in part because Brooklyn police officers falsified/manufactured evidence by coercing and pressuring witnesses to inculpate defendants and threatened those witnesses who were reluctant, often with jail time or physical violence:

     a. Colin Warner (crime in 1980; convicted in 1982; conviction vacated, and upon information and belief, the indictment dismissed in 2001; District Attorney's office did not oppose the motion to vacate): witness provided an affidavit saying that he only identified Warner as the killer because he was pressured by police;

     b. Cy Greene (crime in 1983; convicted in 1985; conviction vacated in 2006, and indictment dismissed in 2007):  police coerced a witness to make the false statement that Greene was at the scene and stabbed victim; police also  tampered with line-up identification by showing a different  witness the defendant in a holding cell prior to the line-up;

38

c.  Barry Gibbs (crime in 1986; convicted in 1988; conviction vacated, and upon

information and belief, indictment dismissed in 2005; District Attorney's office

joined in the motion to vacate): the State's only eyewitness at the criminal trial,

who had testified that he had seen Mr. Gibbs disposing of the victim's body,

revealed that he lied and had never believed that Mr. Gibbs was the murderer, but

had identified Mr. Gibbs and testified against him only under coercion and

intimidation by NYPD detectives, one of whom had threatened his family if he

did not identify Gibbs in the lineup and again in court;

d.  Derrick Deacon (crime in 1989, convicted in 1989 acquitted on retrial in 2013):

though a witness had repeatedly told police officers and prosecutors that she had

seen a different man fleeing the scene of the crime; officers continually harassed

her, and encouraged her to identify Deacon as the killer;

e.  Jonathan Fleming (crime in 1989, convicted in 1990, conviction vacated and

indictment dismissed in 2014; District Attorney's office joined in the motion to

vacate): witness, who was seven months pregnant was coerced into identifying

Fleming as the shooter; she was told that if she did not state Fleming was the

shooter she would have her baby in jail;

f.  Sami Leka (crime 1988; convicted in 1988; 2nd Cir vacated in 2001; 2002

indictment dismissed): police had pressured the two eye witnesses into identifying

Leka by telling them the police were sure he was the man and that he already had

a criminal record;

g.  Derrick Hamilton (crime in 1991; convicted in 1992; conviction vacated and

indictment dismissed 2015; District Attorney's office joined in the motion to

vacate): sole witness identifying Hamilton as the shooter only did so because the

detective threatened to charge her with the crime if she did not identify Hamilton;

when this witness recanted she was again threatened by the detective with

imprisonment and that her loss of her children;

h.  William Lopez (crime 1989; convicted in 1990; conviction vacated and

indictment dismissed in 2013; District Attorney's office joined in the motion to

vacate): police coerced four witnesses into giving false statements and identifying

Lopez as the shooter or as possessing a shotgun, threatening each of them with

incarceration, and one of the them, additionally, with deportation;

i.  David Ranta (crime in 1990; convicted in 1991; conviction vacated and

indictment dismissed 2013; District Attorney's office joined in the motion to

vacate): one of the witnesses who identified Ranta in the lineup said the lead

police detective told him to pick "the guy with the big nose," so he picked Ranta

because he had the biggest nose; this witness has affirmed under oath that he did

not recognize Mr. Ranta; another witness has admitted to the KCDA's

Conviction Integrity Unit that evidence pointing to Ranta as the shooter was a

complete fabrication and that Ranta was framed by  the detective ;

j.  Ronald Pondexter (crime in 1992; convicted in 1993; acquitted on retrial in 1997):

witness said that the detective had shown her Pondexter's photograph and

persuaded her that he was the gunman and coerced her to identify Pondexter.

138.    In other cases, all in Brooklyn—including Lamont Branch, Alvena Jannette,

David Ranta, Jonathan Fleming, Antonio Yarbough, and Sharif Wilson—police

falsified/manufactured evidence by offering witnesses rewards and bribes for testimony inculpating the defendants.

139.    Detectives in Brooklyn in the late 1980s and early 1990s also falsified/manufactured evidence by manufacturing confessions:

     a.    <u>Shabaka Shakur (crime in 1988; convicted 1989; conviction vacated in 2015)</u>: the detective manufactured a statement implicating Mr. Shakur in the murders, that Mr. Shakur claims he never made, and did not sign; indeed, in vacating the conviction the judge reasoned that the detective did not have notes for the type of written statement, did not show or read the statement to Mr. Shakur, and did not ask him to read it;

     b.    <u>David Ranta (crime in 1990; convicted in 1991; conviction vacated and indictment dismissed 2013; District Attorney's office joined in the motion to vacate)</u>: the detective fraudulently obtained a purported confession from Ranta by telling him he "needed to sign a manila folder in order to be able to make a phone call";  unbeknownst to Ranta, the detective had written a statement inside the folder, where Ranta purportedly confesses to acting as the lookout for the anticipated robbery.

140.    On July 7, 1994,  the *Report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department* (the "Mollen Report") confirmed that the falsification/manufacturing of evidence in the NYPD throughout the 1980s and 1990s was so widespread, that supervisors knew or should have known about the falsifications, that supervisors' were not held accountable for their supervisees' misconduct, and

that no attempt was made within the NYPD to eliminate this widespread and persistent practice of falsifications.

141.    According to the Mollen Report, "falsification is widely tolerated by corrupt and honest officers alike, as well as their supervisors. …[O]fficers told [the Commission] that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them."

142.    The Mollen Report concluded, police falsification was "probably the most common form of police corruption facing the criminal justice system," founded in "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world" and a "persistent belief among many officers" that obscuring truth in order to obtain convictions "is necessary and justified, even if it is unlawful."

143.    The Mollen Report further stated:

> When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search or other police action and that civil rights are merely an obstacle to aggressive law enforcement, the Department's top commanders must share the blame. Indeed, we found that for years the Department was content to address allegations of perjury on a case-by-case basis, rather than pursuing the potential for a broader based investigation. For example, supervisors were rarely, if ever, held accountable for the falsifications of their subordinates. [The Commission is] not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch . . . There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including Police Commissioners and Internal Affairs Chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.  (emphasis added)

144.     In addition, the Mollen Report found that police falsification was so widespread and persistent that prosecutors even "acknowledged – off the record – that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored."

145.     A second report, *Report of the Office of the Comptroller on Police Department Monitoring of Lawsuits and Claims of Police Misconduct,* issued in 1992 under Comptroller Elizabeth Holtzman ("Holtzman Report"), presented additional evidence of the widespread and persistent policy or custom of unconstitutional NYPD misconduct during the time period Mr. Stuckey was arrested, and the fact that the City did not take adequate corrective or preventive measures. The Holtzman Report examined police misconduct claims brought against the City from fiscal year 1987 through fiscal year 1991.

146.     According to the Holtzman Report, during the 1980s, the NYPD did not have a policy in place to identify and reprimand NYPD members who had engaged in misconduct. It found that "until recently [the report was issued in 1992] the NYPD had no system for automatic monitoring of police officers who had been the subject of civilian complaints."  During the relevant period

> the NYPD tolerated a significant number of complaints before taking corrective action. In the department's own words it would take an 'inordinate' number of complaints before an officer was targeted for training.

147.     The Holtzman Report also stated that the NYPD "relied upon individual Law Department attorneys … to notify it if NYPD policies or procedures are called into question by the facts of a particular case. But there is no policy in the Law Department requiring individual attorneys routinely to review cases and advise the NYPD if there are such problems that need correcting."

148.    The examples of police falsification/manufacturing of evidence cited in paragraphs 134-139 are likely just the tip of the iceberg. According to news reports and court cases, it has been revealed that Brooklyn Detective Louis Scarcella participated in fabricating/manufacturing evidence, including obtaining false confessions, procuring false witnesses, coaching and/or suborning perjury from witnesses, and withholding exculpatory evidence.  Indeed the KCDA is currently investigating more than 70 cases that relied on Scarcella's work. Seven of the exonerations discussed in paragraphs 137 and 139, were cases on which that Detective Louis Scarcella had worked.  In vacating a conviction based on witness identification testimony that Scarcella procured, a court emphasized Scarcella's "malfeasance in fabricating false" evidence.  *See People v. Hargrove*, 49 Misc. 3d 1208(A) (N.Y. Sup. Ct. 2015).

149.    According to testimony taken at a court hearing, Scarcella stated on the *Dr. Phil* show in 2007 show that "there were no rules when it came to prosecuting homicide cases and that he did not play by the rules (6/24/14 Transcript. P. 81)."  *See People v. Hargrove*, 49 Misc. 3d 1208(A) (N.Y. Sup. Ct. 2015).  The court noted that "This statement indicates an acknowledgment of a lack of disregard for rules." *Id.*

150.    Given the long duration of Scarcella's misconduct (he was on the police force from 1973 to 1999) coupled with Scarcella's high profile statements, supervisory personnel on the NYPD must have been aware of the misconduct, but failed to take adequate corrective or preventive measures.

151.    NYPD supervisors and policymakers were provided notice of the need to properly instruct, train, supervise, and/or discipline employees with regard to their constitutional obligations not to falsify/manufacture evidence by the judicial decisions, wrongful convictions, examples that that the Mollen Report and Holzman Report relied upon, and the widespread

practice of abuse in the NYPD.  Such examples should put the NYPD on notice and/or should have put the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligation not to falsify/manufacture evidence.

152.    The NYPD nonetheless failed to properly instruct, train, supervise, and/or discipline employees regarding issues related to falsification/manufacturing of evidence, despite knowing to a moral certainty, in light of these cases, reports, and circumstances, that such issues regularly arise in the investigation and prosecution of criminal cases; that such issues present police employees with difficult choices of the sort that instruction, training, supervision, and/or discipline will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees falsifying/manufacturing evidence and by the incentives that police employees have to make the wrong choice in such situations; and that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of individuals suspected of or charged with a crime and cause them constitutional injury.

153.    NYPD supervisors were deliberately indifferent to the rampant misconduct, including the falsification/manufacturing of evidence similar to the practices used in  Stuckey's arrest and prosecution as well as the other arrests and prosecutions described above.

154.    Throughout the 1980s and early 1990s, NYPD supervisors and policymakers were aware of a serious risk of constitutional violations caused by the NYPD members falsification/manufacturing of evidence, and that the failure to take any action in response to this problem—whether through training or discipline—was the result of deliberate indifference to the constitutional rights of all individuals suspected or charged with crimes, including Stuckey.

The NYPD's Policy and Practice of Failing to Disclose Exculpatory Material

155.   In Stuckey's case the Named Defendants, suppressed exculpatory evidence and, upon information and belief, did not turn this information over to the District Attorney.  For example, they failed to create DD-5s of the interview with Ms. Hank in which she looked at mug books, and did not identify Stuckey or McCallum, and did not create DD-5s of the four interviews with Munford.

156.    In the years surrounding Stuckey's arrest prosecution, members of the NYPD regularly withheld exculpatory information.

157.   In Brooklyn alone, in 1983 through 1992, at least eight individuals who have been exonerated or acquitted on retrial were convicted, at least in part, because Brooklyn police officers failed to disclose exculpatory material have been:

    a.   Cy Greene (crime in 1983; convicted in 1985; conviction vacated in 2006, and indictment dismissed in 2007): police omitted exculpatory information from DD5s (specifically that alternative suspects who bore no rebalance to Cy Greene were near the scene of the crime around the time of the crime), and failed to create a report of a suspect escaping from custody, and  omitted any reference to at least one material witness from police reports who would have been a source of information for identifying the suspects;

    b.   Alvena Jennette, & Darryl Austin (crime in 1985; convicted in 1988; conviction vacated and indictment dismissed in  2014; District Attorney's office joined in the motion to vacate): documents that indicated an alternative shooter were in the police file, but they were not made part of a DD-5, were not made available to the prosecution, and were not, turned over to the Defense at the time of trial;

c. <u>Todd Lumpkins (crime 1986; convicted 1987; acquitted on retrial 1989):</u> judge ruled that the detective had failed to turn over key information to prosecutors – a witness had described suspects who did not resemble Lumpkins and did resemble a description of a suspect given by a defense witness;

d. <u>Jonathan Fleming (crime 1989, convicted in 1990, conviction vacated and indictment dismissed in 2014; District Attorney's office joined in the motion to vacate):</u>  two police members had a letter from the Orlando Police Department verifying that Fleming was in Orlando, and thus, could not have committed the murder, but did not disclose this exculpatory information; additionally police and prosecutors withheld the existence of a time-stamped receipt from an Orlando hotel further proving Fleming was in Orlando;

e. <u>Derrick Deacon (crime 1989, convicted in 1989, acquitted on retrial in 2013):</u> a witness had initially told police officers that she saw a different man fleeing the scene of the crime, but was subsequently coerced into identifying Deacon; these initial exculpatory statements were not documented in DD-5s or anywhere else in the police file, and, upon information and belief the police did not disclose this negative identification to the district attorneys who tried Deacon's case;

f. <u>David Ranta (crime 1990, convicted in 1991, conviction vacated and indictment dismissed 2013; District Attorney's office joined in the motion to vacate):</u> as the KCDA's office noted in an affirmation supporting Ranta's vacatur of conviction Detective Scarcella and his partner concealed exculpatory evidence pointing to Joseph Astin rather than Ranta as the shooter, by, *inter alia*, failing to document in DD5s or any police reports or notes meetings with witnesses, interviews, or

investigations of other possible defendants, and failing to document that they

spoke with Joseph Austin's widow regarding the investigation into the murder;

g.  Derrick Hamilton: (crime in 1991; convicted in 1992; conviction vacated and

indictment dismissed 2015; District Attorney's office joined in the motion to

vacate): a witness who had subsequently identified Hamilton as the shooter

initially stated that she did not witness the crime, and, upon information and

belief, police failed to turn over to prosecution documentation of the witness's

initial exculpatory statement.

158.    NYPD officers' failure to disclose exculpatory material was not confined to

Brooklyn alone.  For example, in Queens, when Charles Daniels was investigated for a 1979

crime, upon information and belief, detectives withheld evidence from defense and prosecution

lawyers that the sole witness, who was a 10 year old boy, was under treatment as emotionally

disturbed, was unreliable, and had identified someone else before Daniels.  Mr. Daniels was

convicted in 1979, the conviction was reversed by an appellate court in 1982, and the indictment

was dismissed in, upon information and belief, 1983.

159.    Numerous additional credible allegations were made in the years leading up to

Stuckey's arrest, many substantiated by judicial decisions, that police officers had failed to

disclose exculpatory information and wrongfully withheld, lost, or destroyed evidence favorable

to the defense that they had been required to timely disclose to the prosecution or the defense

under *Brady*.  For example, the following published court decisions related to crimes committed

in 1970s and 1980s particularly demonstrates NYPD's widespread and persistent policy and

practice of withholding exculpatory information, and should have put supervisors on notice of

this pattern and practice:

a.  *Walker v. City of New York*, 974 F.2d 293, 294 (2d Cir. 1992).  The Second

Circuit stated that "[i]n 1971 police officers and prosecutors [in Brooklyn]

covered up exculpatory evidence and committed perjury in order to insure

Walker's conviction despite their knowledge of Walker's probable innocence."

b.  *Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985).  Carter was arrested for a

1981 crime, convicted in 1982, and had his conviction vacated in 1984 when

someone else confessed to the crime. In Carter's subsequent § 1983 claim against

New York City the court denied the City's summary judgement motion against

the plaintiff's *Monell* claim because Carter had alleged and provided sufficient

support for the allegations that, in his case, the police had failed to turn over

exculpatory evidence to the District Attorney's office  or to the defense, and did

not properly train police officers regarding the preservation of *Brady* material.

Specifically, Carter had alleged and submitted affidavits that supported his

allegations that there were four instances in which the police suppressed

exculpatory evidence and failed to turn that evidence over to the DA's office or

Carter.  These four pieces of exculpatory evidence that were not turned over to

prosecutors of Carter were: (i) a witness told police officers he observed someone

other than Carter running down the street near the crime with a bloody shirt; (ii) a

police officer responding to the incident observed someone other than Carter

running down the street near the crime with a bloody shirt; (iii) a witness made a

statement that supported Carter's alibi, and (iv) there were significant facts

casting doubt on credibility and reliability of the police officer who interviewed

the key prosecution witness and testified at trial, including that, at the time he

testified, he was under psychiatric care, had been relieved of his gun and placed on restrictive duty, all as result of his threats to take his own life and that of his superior officer because, upon information and belief, that officer denied his request for a promotion based on his work on the investigation of Carter. Regarding Carter's *Monell* claim, the court held that New York City had "failed to adopt an appropriate policy or provide sufficient training with regard to the preservation and production of exculpatory evidence by individual members of the police force." In addition, in opposition to the City's motion to reconsider the court's refusal to grant summary judgment against Carter's *Monell* claim, Carter presented additional evidence that the NYPD had failed to train police officers regarding their obligations to record and turn over exculpatory material to prosecutors.  For example, on May 31, 1985, the then- Chief of Detectives testified at a deposition that NYPD detectives had large discretion regarding the recording of information in the course of the investigation and that what is recorded – and hence turning over to ADAs— is mostly "taught" from "guidance by superiors. . .  and a lot of it is just plain common sense as to what is important and what is not important."

c.  *People v. Saddy*, 84 A.D.2d 175, 445 N.Y.S.2d 601 (2d Dep't 1981).  The court reversed convictions where police violated committed *Brady* violations by erasing recorded conversations between law enforcement officer and defendant.

d.  *People v. Springer*, 122 A.D.2d 87, 504 N.Y.S.2d 232 (2d Dep't 1986).  The court held the police's destruction of surveillance photographs was a *Brady* violation.

    e. *People v. Lumpkins*, 141 Misc. 2d 581, 533 N.Y.S.2d 792 (Sup. Ct. Kings Cty.

       1988). The court vacated a conviction where the detective withheld *Brady*

       material from the prosecution.

    f. *People v. Cortez*, 149 Misc. 2d 886, 898, 564 N.Y.S.2d 963 (Crim. Ct. Kings Co.

       1990). The court dismissed the indictment where police erased subpoenaed

       recording of radio communication, acting "contrary to. . . [the] spirit" of *Brady*.

160. NYPD supervisors and policymakers were provided notice of the need to properly instruct, train, supervise, and/or discipline employees with regard to their constitutional obligations by these judicial decisions— in particular *Carter v. Harrison* and *Walker v. City of New York*—which directly criticized the NYPD for failing to train or supervise their officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies. Such cases put the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their *Brady* obligations.

161. NYPD supervisors and policymakers were further provided notice by numerous decisions of the United States Supreme Court, the United States Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule, the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, fail to disclose, destroy, and suppress, evidence favorable to a criminal suspect or defendant.

162. The NYPD nonetheless failed to properly instruct, train, supervise, and/or discipline employees regarding *Brady* issues, despite knowing to a moral certainty, in light of these cases, reports, and circumstances, that such issues regularly arise in the investigation and

prosecution of criminal cases; that such issues present police employees with difficult choices of the sort that instruction, training, supervision, and/or discipline will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations and by the incentives that police employees have to make the wrong choice in such situations; and that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

The KCDA's Policy and Practice of Failing to Turn Over *Brady* Material/Exculpatory Evidence and *Rosario* Material

163.    In violation of their constitutional duties, prosecutors from the KCDA's Office failed to turn over *Brady* material to defendants in many of the cases identified in paragraphs 137 and 157 and, upon information and belief, in countless other cases.

164.    For example, After Larry Gurley's 1972 conviction, a 1991 Freedom of Information Law request uncovered an exculpatory ballistics report from the NYPD—which supported Gurley's account that he acted in self-defense –that prosecutors had never provided to the defense Mr. Gurley's conviction was vacated in 1992 and the  indictment was dismissed in 1994.

165.    Prosecutors in Eric Jackson-Knight's 1980 prosecution withheld reports in an arson case that their expert had determined the fire to be an accident and that evidence of arson had been fabricated. Mr. Jackson-Knight's conviction was vacated in 1988, and he was acquitted on retrial in 1994.

166.     Prosecutors who secured Scott Fappiano's 1985 conviction withheld evidence that the victim, who testified against the defendant at trial, had previously failed to identify him as the perpetrator. Mr. Fappiano's conviction was vacated and the indictment was dismissed in 2006.

167.     After Floyd Batten's 1984 conviction, a Freedom of Information Law request uncovered exculpatory police reports that were never turned over to the defense.  Mr. Batten's conviction was vacated in 2003, and the indictment was dismissed in 2014.

168.     In 1984, prosecutors concealed reports in Calvin Boyette's case reflecting witness reports that someone other than Boyette had committed the offense and that Boyette did not match the victim's initial description of her attacker. Mr. Boyette's conviction was vacated and the indictment was dismissed in in 2001.

169.     Similarly, in Cy Greene's case, in 1985, prosecutors along with police officers suppressed witness descriptions that did not match the defendant and evidence that a key witness had initially named a man other than defendant as the perpetrator. Mr. Greene's conviction was vacated in 2006, and the indictment was dismissed in 2007.

170.     In Sami Leka's case in 1990, prosecutors worked with police officers to keep from the defendant the identity of eyewitnesses who would have contradicted the accounts of witnesses who testified against him at trial. Mr. Leka's conviction was vacated in 2001, and the indictment was dismissed in 2002.

171.     And at William Lopez's 1990 trial, prosecutors elicited false testimony that a witness had received no inducement to testify against the defendant. Mr. Lopez's conviction was vacated and the indictment was dismissed in 2013.

172.    The prosecutors who tried John Manfredi in 1989 withheld evidence that a key witness had previously declared the defendant not to have committed any crime. Mr. Manfredi's conviction was vacated and the indictment was dismissed in 1994.

173.    The Mollen Report, discussed in paragraphs 140-144 confirmed that prosecutors in New York City throughout the 1980s and 1990s knew about and routinely ignored the use of perjured testimony in their prosecutions.

174.    Moreover, multiple judicial decisions had been issued overturning convictions based on the KCDA's failures to turn over exculpatory evidence. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (noting that defendant's conviction was vacated in 1990 for prosecutorial failure to disclose, *inter alia*, victim's identification of another individual as perpetrator); *New York v. Gurley*, 602 N.Y.S.2d 184 (2d Dep't 1993) (affirming vacatur of defendant's 1972 conviction where ballistics report contradicting prosecution's theory was withheld); *New York v. Jackson*, 154 Misc. 2d 718 (N.Y. Sup. 1992) (confirming prior, 1988 vacateur of conviction, finding that prosecutor had suppressed evidence of defendant's guilt and destroyed notes favorable to defendant and concluding that "society was the loser in this trial"); *New York v. Vilardi*, 542 N.Y.S.2d 238 (1989) (vacating arson conviction because prosecution violated defendant's rights under *Brady* by withholding bomb squad expert report stating that no explosion had occurred), *aff'd* 76 N.Y.2d 67 (1990).

175.    In the years surrounding Stuckey's prosecution, prosecutors from the KCDA's Office also regularly failed to turn over *Rosario* material to defendants, in violation of their constitutional duties.  For example, prosecutors committed *Rosario* violations in the following cases:

a.  *People v. Perez*, 65 N.Y.2d 154 (1985) (finding that the prosecution committed a *Rosario* violation by withholding from defense counsel statements made by a prosecution witness to members of the defendant's family that were directly related to the witness's trial testimony);

b.  *People v. Ranghelle*, 69 N.Y.2d 56 (1986) (superseded by statute) (reversing conviction and ordering a  new trial where the prosecution failed to produce *Rosario* material before evidence was closed at trial);

c.  *People v. Cardona*, 526 N.Y.S.2d 203, 204 (2d Dep't 1988) (granting defendant's motion to vacate conviction and ordering a new trial upon finding that the prosecution committed a *Rosario* violation by failing to turn over the signed statement of the People's key witness, which included descriptions of the perpetrators that were not consistent with the defendant's appearance);

d.  *People v. McFarlane*, 533 N.Y.S.2d 479 (2d Dep't 1988)  (1987 conviction reversed and new trial ordered where the prosecution committed a *Rosario* violation by failing to timely provide defense with a witness's prior sworn statement);

e.  *People v. Jackson*, 142 Misc. 2d 853, 538 N.Y.S.2d 677 (Sup. Ct. Kings Co. Crim. Term 1988) – vacating Jackson's 1980 conviction where the prosecution violated the *Rosario* rule by failing to turn over to defense a memo containing a synopsis of a prosecution witness's prior statements);

f.  *People v. Lugo*, 153 A.D.2d 761, 544 N.Y.S.2d 985 (2d Dep't 1989) (granting defendant's motion to vacate his 1981 conviction where the prosecution violated the *Rosario* rule);

g. *People v. Cortez*, 149 Misc. 2d 886, 898, 564 N.Y.S.2d 963 (Crim. Ct. Kings Co. 1990) (criminal complaint dismissed where the prosecution violated its affirmative obligation to preserve from erasure a police tape that constituted *Rosario* material).

176.   Given the customs, practices, and policies of prosecutors in the KCDA's office—including suppression of exculpatory evidence/*Brady material* and elicitation of false testimony, and failure to turn over *Rosario* material—DA supervisors were well aware of their staff's misconduct.

177.   Supervisors at the DA made no attempt to discipline the attorneys involved in these cases or any of the myriad others in which defendants' constitutional rights were violated by the failure to turn over exculpatory evidence/*Brady* material, the use of testimony that prosecutors knew, but did not disclose, to be questionable at best, and the failure to turn over *Rosario* material.

178.   In addition, policymaking officials in the KCDA's office failed to instruct, train, and/or supervise employees with respect to their constitutional obligations, despite knowing to a moral certainty that similar concerns about *Brady* and reliable testimony and *Rosario* material arise in the investigation and prosecution of criminal cases, that such issues present prosecutors with difficult choices of the sort that instruction, training, supervision and/or discipline will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of prosecutors mishandling such situations and by the incentives that prosecutors have to make the wrong choice in such situations; and that the wrong choice will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury. Supervisors were on notice that the failure to train and

discipline prosecutors was causing violations of citizens' rights, and yet they remained deliberately indifferent to these violations, failing to provide the necessary training and correction. Prosecutors learned that they could employ unconstitutional, illegal and unjust tactics to secure convictions at the expense of defendants' due process rights without consequence to themselves.

## FIRST CLAIM FOR RELIEF

### (42 U.S.C. § 1983; Malicious Prosecution Against Detectives Butta and O'Keeffe)

179.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.    The Named Defendants initiated, or caused the initiation of, criminal proceedings against Mr. Stuckey.

181.    The Named Defendants created false information and fabricated evidence likely to influence the grand and petit juries.  Their misdeeds include but are not limited to physically abusing and coercing Mr. Stuckey and  Mr. McCallum, and telling both teenagers what false statements to make on their videotaped confession —which Mr. Stuckey and McCallum subsequently made.

182.    The Named Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Mr. Stuckey, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Mr. Stuckey and obtain his conviction and imprisonment.

183.    The Named Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to

manufacture, false evidence that they intended to use against Mr. Stuckey in criminal proceedings, and/or which they caused to be used as a basis for Mr. Stuckey's prosecution and conviction.

184.    The Named Defendants did so knowing that the evidence was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

185.    The Named Defendants engaged in numerous other acts of misconduct that they could reasonably foresee would contribute to the deprivation of Mr. Stuckey's liberty.  This misconduct includes, but is not limited to: (i) declining to pursue Heyward and Munford as suspects despite the numerous pieces of evidence against them; (ii) not creating a DD-5 of the visit to Kathy Hank, which provided the highly exculpatory evidence of Mr. Stuckey; (iii) never asking Johnson, Heyward, Mr. Stuckey or Mr. McCallum what type of gun was used; (iv) not attempting to find and interview Aunt Lottie or Jaime; (v) relying on Heyward and Johnson's self-serving statements linking Mr. Stuckey to the gun, despite the fact that the gun was never found and both were obviously unreliable witnesses who had had a tremendous motivation to lie; (vi) not creating a DD-5 of any of the four interviews with Munford and not relaying the exculpatory fact that Munford was at the crime scene when Mr. Blenner's body was discovered; (vii) not questioning the fact that the gun was never found; Mr. Stuckey and Mr. McCallum's fingerprints were not on Mr. Blenner's car or the kerosene can used to burn the car; and neither Mr. Stuckey nor Mr. McCallum were able to drive a car, and thus, would not have been unable to drive Mr. Blenner's car around for several hours in unknown parts of the New York City.

186.    Without the false evidence that the Named Defendants wrongfully manufactured or knew had been wrongfully manufactured, and their other acts of misconduct there would have been no basis to arrest, prosecute and convict Mr. Stuckey.

187.   Thus, the Named Defendants knew that they lacked probable cause to initiate criminal proceedings against Mr. Stuckey.

188.   Additionally, the Named Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Mr. Stuckey of *Brady* material.

189.   The Named Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Kings County District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Mr. Stuckey based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Mr. Stuckey's unconstitutional conviction and resultant injuries by not disclosing such evidence.

190.   Notwithstanding their awareness of their duties, the Named Defendants, prior to, and during Mr. Stuckey's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Mr. Stuckey.

191.   The Named Defendants acted with actual malice, as demonstrated by, *inter alia*: their decision to falsely manufacture probable cause for Mr. Stuckey's arrest and prosecution; their intentional and/or reckless disregard for proper investigative techniques and NYPD policies, including their willingness to manufacture a false confession from Mr. Stuckey, their decision to ignore valid evidence and investigative leads that pointed to Mr. Stuckey's innocence and rely on obviously unreliable individuals.

192.   The prosecution terminated in Mr. Stuckey's favor when his convictions were

eventually vacated and the indictment against him dismissed.

193.    The acts and conduct of the Named Defendants constitute malicious prosecution in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

194.    Upon information and belief, the two Named Defendants knew of one another's wrongful acts and displayed deliberate indifference to Mr. Stuckey's constitutional rights by failing to rectify one another's wrongful acts.

## **SECOND CLAIM FOR RELIEF**

**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial Against Detectives Butta and O'Keeffe)**

195.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

196.    The Named Defendants initiated, or caused the initiation of, criminal proceedings against Mr. Stuckey.

197.    The Named Defendants created false information and fabricated evidence likely to influence the Grand and petit juries.  Their misdeeds include but are not limited to physically abusing and coercing Mr. Stuckey and  Mr. McCallum, and telling both teenagers what false statements to make on their videotaped confession —which Mr. Stuckey and McCallum subsequently made

198.    The Named Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Mr. Stuckey, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Mr. Stuckey and obtain his conviction and imprisonment.

199.    The Named Defendants, individually and collectively, manufactured, acted in

concert to manufacture, aided and abetted each other to manufacture, and/or conspired to

manufacture, false evidence that they intended to use against Mr. Stuckey in criminal

proceedings, and/or which they caused to be used as a basis for Mr. Stuckey's prosecution and

conviction.

200.    The Named Defendants did so knowing that the evidence was false or was highly

likely to be false, and/or with deliberate indifference to whether it was true or false.

201.    As a direct and proximate result of the Named Defendants' fabrications, Mr.

Stuckey was wrongfully convicted.

202.    Thus, the Named Defendants knew that they lacked probable cause to initiate

criminal proceedings against Mr. Stuckey.

203.    Additionally, the Named Defendants, acting individually and in concert and

conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge

from Mr. Stuckey of *Brady* material.

204.    The Named Defendants knew they had duties under the United States

Constitution as well as the laws and regulations of the State and the City of New York (a) to

disclose *Brady* material to the Kings County District Attorney's Office so that it could be

disclosed to the defense and used to prevent the conviction of Mr. Stuckey based upon false,

misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the

prosecution concerning the existence of *Brady* material and not to cause or continue Mr.

Stuckey's unconstitutional conviction and resultant injuries by lying about such evidence.

205.    Notwithstanding their awareness of their duties, the Named Defendants, prior to

and during Mr. Stuckey's trial, intentionally, recklessly, and/or with deliberate indifference to

their legal obligations, concealed  *Brady* material from, lied about, and otherwise failed to

disclose *Brady* material to Mr. Stuckey.

206.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding the murder and kidnapping, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Mr. Stuckey's federal constitutional rights.

207.    The aforesaid conduct of the Named Defendants operated to deprive Mr. Stuckey of his right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

208.    Upon information and belief, the two Named Defendants knew of one another's wrongful acts and displayed deliberate indifference to Mr. Stuckey's constitutional rights by failing to rectify one another's wrongful acts.

## THIRD CLAIM FOR RELIEF

### (Malicious Prosecution Claim Under New York Law Against Detectives Butta and O'Keeffe)

209.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

210.    The Named Defendants caused the commencement and continuance of criminal proceedings against Mr. Stuckey.

211.    There was no probable cause for criminal proceedings against Mr. Stuckey, and the Named Defendants knew or should have known as much.

212.    The Named Defendants acted with actual malice.

213.    The criminal proceedings against Mr. Stuckey terminated in his favor when his convictions were vacated and the indictment against him was dismissed.

## FOURTH CLAIM FOR RELIEF

### (42 U.S.C. §1983; Failure to Intercede Against Detectives Butta and O'Keeffe)

214.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

215.    Each of the Named Defendants observed or has reason to know that Mr. Stuckey's constitutional rights were violated by the other Named Defendant.

216.    Each of the Named Defendants had a realistic opportunity to intervene to prevent the harm from occurring, but declined or refused to do so.

217.    No reasonable officer, detective, or supervisor could have believed that the other Named Defendant's conduct did not violated Mr. Stuckey's constitutional rights.

218.    Due to the Named Defendants' conduct, Mr. Stuckey's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendment of the US Constitution were violated.

## FIFTH CLAIM FOR RELIEF

### (Loss of Services Under New York Law Against Detectives Butta and O'Keeffe)

219.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.    As a direct and proximate result of the Named Defendants' unconstitutional and unlawful actions Ms. Nealy has been deprived of Mr. Stuckey's services.

## SIXTH CLAIM FOR RELIEF

### (*Monell* Claim; 42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Against the City)

221.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

222.    Prior to Mr. Stuckey's arrest, and during the course of his prosecution, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioners, and policymaking officials at the KCDA's Office, including but not limited to the District Attorneys, acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duties of police to (1) not falsify/manufacture evidence, and (2) to not fail to disclose exculpatory evidence/*Brady* material to prosecutors and/or defendants, and to provide truthful information to prosecutors about their knowledge of criminal investigations, and (3) duties of members of the District Attorney's office  to make timely disclosure to criminal defendants of *Brady* and *Rosario* material, and to avoid the elicitation of perjurious and/or fabricated testimony.

223.    Prior to Mr. Stuckey's arrest, and during the course of his prosecution, and afterwards violations of these constitutional duties were widespread throughout the NYPD and KCDA's Office. Through their inaction and failure to address them, policymaking officials at the NYPD and KCDA's Office constructively acquiesced in the widespread violations of these constitutional duties by their subordinates.

224.    Policymakers at the NYPD and KCDA's Office knew or should have known, to a moral certainty, that(1) NYPD members had the capacity to falsify/manufacture evidence and withhold exculpatory evidence/*Brady* material from prosecutors and/or defendants, and  (2) prosecutors would be in possession of *Brady* and *Rosario* material, would interview witnesses, and would elicit their testimony before juries; that such issues presented employees with difficult choices of the sort that instruction, training, and supervision would have make less difficult; that

the need for further instruction, training, supervision and discipline was demonstrated by a history of employees mishandling such situations; and that wrong choices by employees concerning these activities would frequently cause violations of the constitutional rights of criminal suspects and the accused and cause them constitutional injury. Yet policymakers at the NYPD and KCDA failed to provide adequate training and discipline to avoid such violations.

225.    This acquiescence by policymakers and their failure to train or discipline their subordinates directly, proximately, and substantially caused violations of Mr. Stuckey's due process rights.

## SEVENTH CLAIM FOR RELIEF

### (Malicious Prosecution Claim Under New York Law Against the City)

226.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

227.    The Named Defendants and John Doe and Jane Roe et al. caused the commencement and continuance of criminal proceedings against Mr. Stuckey.

228.    There was no probable cause for criminal proceedings against Mr. Stuckey, and the Named Defendants and John Doe and Jane Roe et al. knew or should have known as much.

229.    The Named Defendants and John Doe and Jane Roe et al. acted with actual malice.

230.    The criminal proceedings against Mr. Stuckey terminated in his favor when his convictions were vacated and the indictment against him was dismissed on October 15, 2014 and June 9, 2015.

231.    Defendant City is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, the Named Defendants, and John Doe and Jane Roe. et al.

## EIGHTH CLAIM FOR RELIEF

**(Negligent Hiring, Retention, Training and Supervision under New York Law Against the City)**

232.    Plaintiff repeats and realleges each and every allegation set forth above.

233.    Defendant City and its employees, servants and/or agents acting within the scope of their employment did negligently hire, retain, train and supervise the Named Defendants and John Doe and Jane Roe et al., individuals who were unfit for the performance of police duties between October 21, 1985 and October 27, 1986.

234.    Plaintiff suffered injury and damages as a result of the Defendants' conduct.

## JURY DEMAND

235.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages against the Defendants in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.    An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other further relief as the Court may deem just and proper.

Dated: January 8, 2016
       New York, New York

SIEGEL TEITELBAUM & EVANS, LLP

By: _____
       Norman Siegel

By: _____
       Herbert Teitelbaum
       Sharon Sprayregen
       260 Madison Avenue, 22nd Floor
       New York, NY 10016
       (212) 455-0300

       Timothy C. Parlatore
       FISHERBROYLES LLP
       445 Park Avenue, Ninth Floor
       New York, New York 10022
       (212) 679-6312

       James Lamb
       24137 Oak Park Drive
       Douglaston, NY 11362
       718-490-8045

       *Attorneys for Plaintiff*